# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE COALITION FOR APP FAIRNESS; FORBES TATE PARTNERS LLC; AND MEGHAN DIMUZIO,<br><br>                 Non-Party Movants,<br><br>v.<br><br>APPLE INC.,<br><br>               Defendant. | Misc. Case No. _____<br><br>Underlying Litigation:<br><br>*Cameron v. Apple, Inc.*,<br>   No. 4:19-cv-3074<br>*In re Apple iPhone Antitrust Litigation*,<br>   No. 4:11-cv-6714<br><br>U.S. District Court for the Northern District of California |

# STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO QUASH SUBPOENAS

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

BACKGROUND .................................................................................................................... 3

    A.    The Coalition for App Fairness.......................................................................... 3

    B.    App Store Antitrust Litigation ......................................................................... 5

    C.    The Document Requests .................................................................................... 6

ARGUMENT .......................................................................................................................... 8

I.    LEGAL STANDARDS ................................................................................................ 9

    A.    Third-Party Discovery .................................................................................... 9

    B.    First Amendment Privilege ............................................................................ 10

II.    THE REQUESTED MATERIALS ARE SUBJECT TO A FIRST AMENDMENT
PRIVILEGE AGAINST COMPELLED DISCLOSURE................................................ 12

    A.    All of the Document Requests Implicate First Amendment Concerns..................... 12

    B.    The Movants Have Made a *Prima Facie* Showing that the Materials
Requested Are Subject to the First Amendment Privilege ......................... 15

III.    THE REQUESTED MATERIALS ARE NOT "HIGHLY RELEVANT" TO THE
UNDERLYING ANTITRUST CASES.................................................................. 19

IV.    APPLE OTHERWISE SEEKS MATERIALS THAT ARE NOT RELEVANT,
ARE DISPROPORTIONAL TO THE NEEDS OF THE CASE, AND ARE
UNREASONABLY DUPLICATIVE .................................................................. 22

CONCLUSION.................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AFL-CIO v. FEC,*
333 F.3d 168 (D.C. Cir. 2003) .................................................................10, 12, 13, 15

*All. of Auto. Mfrs., Inc. v. Jones,*
No. 08-cv-555, 2013 WL 4838764 (N.D. Fla. Sept. 11, 2013) .........................13, 14

*Apple Inc. v. Pepper,*
139 S. Ct. 1514 (2019)......................................................................................................6

*Ass'n of Equip. Mfrs. v. Burgum,*
427 F. Supp. 3d 1082 (D.N.D. 2019).......................................................................13

*Black Panther Party v. Smith,*
661 F.2d 1243 (D.C. Cir. 1981) ................................................................................11

*Buckley v. Valeo,*
424 U.S. 1 (1976).........................................................................................................10

*Calzone v. Summers,*
942 F.3d 415 (8th Cir. 2019) ..............................................................................13, 14

*FEC v. Machinists Non-Partisan Pol. League,*
655 F.2d 380 (D.C. Cir. 1981) ...................................................................................14

*Flynn v. Square One Distrib., Inc.,*
No. 16-mc-25, 2016 WL 2997673 (M.D. Fla. May 25, 2016) .........................10, 11

*FTC v. Superior Ct. Trial Laws. Ass'n,*
493 U.S. 411 (1990).....................................................................................................13

*Herbert v. Lando,*
441 U.S. 153 (1979)........................................................................................................9

*Int'l Union v. Nat'l Right to Work Legal Def. & Educ. Found., Inc.,*
590 F.2d 1139 (D.C. Cir. 1978)...............................................................................2, 14

*Johnston v. Hertz Loc. Edition Corp.,*
331 F.R.D. 140 (E.D. Cal. 2019) ...............................................................................21

*Kusper v. Pontikes,*
414 U.S. 51 (1973)........................................................................................................10

*McIntyre v. Ohio Elections Comm'n,*
514 U.S. 334 (1995).....................................................................................................10

*Millennium TGA, Inc. v. Comcast Cable Commc'ns LLC,*
286 F.R.D. 8 (D.D.C. 2012)..........................................................................................9

*N.C. Right to Life, Inc. v. Leake,*
231 F.R.D. 49 (D.D.C. 2005)......................................................................................21

ii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*NAACP v. Alabama*,
    357 U.S. 449 (1958)..........................................................................................................10, 13

*Perry v. Schwarzenegger*,
    268 F.R.D. 344 (N.D. Cal. 2010)..................................................................................22

*Perry v. Schwarzenegger*,
    591 F.3d 1147 (9th Cir. 2010) ............................................................................ *passim*

*Pulte Home Corp. v. Montgomery Cnty.*,
    No. GJH-14-3955, 2017 WL 1104670 (D. Md. Mar. 24, 2017)....................... *passim*

*Sol v. Whiting*,
    No. 10-cv-01061, 2013 WL 12098752 (D. Ariz. Dec. 11, 2013)....................................13, 14

*United States v. Kellogg Brown & Root Servs., Inc.*,
    284 F.R.D. 22 (D.D.C. 2012)..........................................................................................10, 23

*United States v. Poindexter*,
    727 F. Supp. 1470 (D.D.C. 1989) ..................................................................................10

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
    No. 15-cv-134, 2016 WL 5922315 (W.D. Tex. Oct. 11, 2016)........................13, 14

*Watts v. SEC*,
    482 F.3d 501 (D.C. Cir. 2007)........................................................................................9

*Wyoming v. U.S. Dep't of Agric.*,
    208 F.R.D. 449 (D.D.C. 2002)........................................................................................2, 14

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26................................................................................................................2, 9, 23

Fed. R. Civ. P. 45................................................................................................................7, 9

Lauren Feiner, *'We're all afraid' of Google and Apple, app makers tell Congress*,
    CNBC (Apr. 21, 2021)........................................................................................19

Paul Mozur et al., *A Global Tipping Point for Reining In Tech Has Arrived*,
    N.Y. Times (Apr. 20, 2021)........................................................................................15

This miscellaneous case seeks to quash three substantially similar subpoenas that Apple Inc. has served in connection with two proposed antitrust class-action lawsuits pending in the U.S. District Court for the Northern District of California.  *See* Exs. A–C.[1]  The recipients of the subpoenas, Movants here, are the Coalition for App Fairness (the "Coalition"), a non-profit organization comprised of developers of mobile-device applications ("apps"); Forbes Tate Partners LLC, a public affairs firm engaged by the Coalition; and Meghan DiMuzio, the Coalition's Executive Director and a Vice President at Forbes Tate.  The Coalition recruits and collaborates with app developers and other entities to promote freedom of choice and fair competition across the app ecosystem, including Apple's dominant App Store.

The Movants' activities include coalition-building, research, strategy, exchanging information and opinions, political advocacy, and public relations.  The Movants are not, however, involved in the two underlying antitrust matters, both of which were filed long before the Coalition even existed.  Apple nonetheless seeks a host of documents and communications that go to the heart of Movants' and the Coalition members' First Amendment rights, including the Coalition's formation, activities, meeting minutes, recruitment efforts, membership lists, and financing; communications between and amongst the Movants and Coalition members, potential members, and advisors; and communications between the Movants and any foreign or domestic governmental entity or official relating to Apple or the app ecosystem.

As described in the four Declarations submitted in support of this Motion, compelled disclosure of the Movants' and the Coalition members' confidential political communications to Apple will chill the candor of their discussions and the effectiveness of the Coalition's advocacy efforts.  Member and non-member app developers have every reason to fear that compelled

---

[1] The District of Columbia is the place of compliance for all three subpoenas.

disclosure will expose them to retaliation given Apple's ability to control access to it ubiquitous iOS platform.  Given the First Amendment implications, Apple must satisfy a "heightened relevance standard," demonstrating that the information sought goes to the "heart of the lawsuit" and is of "central or crucial importance to the case."  *Pulte Home Corp. v. Montgomery Cnty.*, No. GJH-14-3955, 2017 WL 1104670, at *5–6, *8 (D. Md. Mar. 24, 2017); *Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 455 (D.D.C. 2002) (quoting *Int'l Union v. Nat'l Right to Work Legal Def. & Educ. Found., Inc.*, 590 F.2d 1139, 1152 (D.C. Cir. 1978)).

Apple cannot meet that demanding standard.  The requested materials concern the Coalition's associational and advocacy efforts.  They have no bearing whatsoever on the underlying antitrust matters, which concern whether Apple unlawfully obtained and exercises monopoly power in a relevant market.  Neither of the two explanations of relevance advanced by Apple's counsel to date—inquiry into unidentified witnesses' "bias" and speculation that some unidentified app developer said something in the course of potential discussions with the Coalition that might be supportive of Apple's App Store policies—support Apple's fishing expedition into materials protected by the First Amendment.  The true purpose of Apple's requests is to pry into the Coalition's internal communications and advocacy efforts.

None of the requests satisfy even the ordinary discovery limits.  Communications between and among non-parties regarding Apple are irrelevant to the claims and defenses in the antitrust cases and are disproportional to the needs of the cases.  *See* Fed. R. Civ. P. 26(b)(1).  To the extent there were any communications between the Movants and the plaintiffs in the two underlying cases—and there is no basis to believe there were—Apple can seek such materials through party discovery.

The subpoenas should be quashed in their entirety.

2

## BACKGROUND

### A.     The Coalition for App Fairness

Launched in September 2020 by a group of thirteen app developers, the Coalition for App Fairness "is an independent nonprofit organization founded by industry-leading companies to advocate for freedom of choice and fair competition across the app ecosystem."  Coalition for App Fairness, https://appfairness.org/ (last visited July 8, 2021).  The Coalition is headquartered in Washington, D.C. and consists of nearly 60 app developer members, some whom have chosen to remain anonymous.  Declaration of Meghan DiMuzio ("DiMuzio Decl.") ¶ 3 (attached as Ex. D).  Since February 2021, the Executive Director of the Coalition has been Meghan DiMuzio, who is also a Senior Vice President at Forbes Tate, a public affairs firm that coordinates the Coalition's activities.  *Id.* ¶ 2.

The Coalition advocates for fair competition across the app ecosystem and opposes anti-competitive practices by owners of online platforms, including Apple's App Store, harmful to app developers and consumers.  *Id.* ¶ 4.  The Coalition has articulated ten "App Store Principles" that it believes should guide the industry, including:

- "No developer should be required to use an app store exclusively, or to use ancillary services of the app store owner, including payment systems";

- "No developer should be blocked from the platform or discriminated against based on a developer's business model, how it delivers content and services, or whether it competes in any way with the app store owner";

- "No developer should be required to pay unfair, unreasonable or discriminatory fees or revenue shares"; and

- "No app store owner should prohibit third parties from offering competing app stores on the app store owner's platform, or discourage developers or consumers from using them."

*Id.*

In the Coalition's view, Apple's policies on the purchase and use of apps on devices with Apple's iOS operating system (including iPhones and iPads) are inconsistent with these principles.  Apple mandates the use of its App Store as a gateway to the use of apps on iOS devices and imposes various requirements and fees on app developers.  For most purchases made within its App Store, Apple takes 30% of the purchase price.  *See* Coalition for App Fairness, *Issue: 30% "App Tax" on Creators and Consumers*, https://appfairness.org/issues/30-app-tax/ (last visited on July 8, 2021).  This "app tax" cuts into consumer purchasing power, stifles developer revenue, and provides Apple's competing apps a competitive advantage.  *See id.* Moreover, the Coalition believes that Apple uses its control of the iOS operating system to favor itself by controlling the products and features that are available to consumers.  *See* Coalition for App Fairness, *Issue: The App Store is Ruled by Anti-Competitive Policies*, https://appfairness.org/issues/anti-competition/ (last visited on July 8, 2021).  Apple further limits consumer freedom by making iOS apps available only through the App Store and prohibiting developers from informing their customers about less expensive options, or they risk being banned from the App Store.  *See* Coalition for App Fairness, *Issue: The App Store Limits Consumer Freedom*, https://appfairness.org/issues/no-consumer-freedom/ (last visited on July 8, 2021).

In furtherance of its mission of promoting fair treatment of app developers, the Coalition and its members engage in various associational and advocacy activities.  The Coalition engages with Congress, state legislators, and foreign officials on issues of concern to its members, such as antitrust legislation.  DiMuzio Decl. ¶ 6.  The Coalition develops and pushes messages and content on behalf of its members.  *Id.*  The Coalition creates resources to educate the public about Apple's policies (*see* https://appfairness.org/resources/); aggregates important news and

developments related to app fairness (*see* https://appfairness.org/news/); and issues public

statements (*see* https://appfairness.org/press-release-innovation-and-choice-act/).  Coalition staff

and members frequently exchange confidential communications amongst each other regarding

solicitation of new members, lobbying public officials, legislative and policy priorities,

messaging strategy, and media outreach.  DiMuzio Decl. ¶ 8.  Coalition staff and members

engage in these communications understanding that they are private.  *Id.* ¶ 13.  Indeed, the

Coalition's membership agreement contains a confidentiality provision that prohibits members

from disclosing Coalition-related business to the public.  *Id.*  Consistent with its mission, the

Coalition is led by public-affairs specialists, not lawyers or antitrust experts.  *Id.* ¶ 6.

> **B.**      **App Store Antitrust Litigation**

The Subpoenas were issued in connection with two proposed class-action antitrust cases

pending against Apple in the Northern District of California.  The first lawsuit, *In re Apple*

*iPhone Antitrust Litigation*, No. 11-cv-06714 (N.D. Cal.), was brought on behalf of a class of

app purchasers ("App Purchaser Case").  The second lawsuit, *Cameron v. Apple Inc.*, No. 19-cv-

03074 (N.D. Cal.), was brought on behalf of a class of app developers ("App Developer Case").

Both cases concern whether Apple unlawfully obtained, maintains, and abuses monopoly power

with respect to its restrictions on apps' access to the iOS platform in violation of the Sherman

Act and/or California's Unfair Competition Law.  The central issues in both cases involve

fundamental aspects of competition and antitrust law, such as the definition of the relevant

market, whether Apple exercises monopoly power, whether Apple engaged in anticompetitive

conduct, and whether plaintiffs suffered a causal antitrust injury.  *See, e.g.*, ECF No. 332,

Developer Pls.' Mot. for Class Certification at 12–17, *Cameron*, No. 19-cv-03074 (N.D. Cal.

June 1, 2021).

The Movants have no involvement in either case.  DiMuzio Decl. ¶ 9.  None of the

Movants is a witness in either case, and both lawsuits were filed long before the Coalition's

launch in September 2020.  The App Purchaser Case was filed in 2011 but was tied up in appeals

for nearly eight years until the Supreme Court resolved that the plaintiffs have standing to bring

their Sherman Act claims.  *See Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019).  The App

Developer Case was filed on September 30, 2019—a year before the Coalition was formed.

Apple's counsel acknowledged during a meet-and-confer on July 1, 2021, that they have no basis

to believe that Movants have any involvement in the litigation.  Movants understand that neither

the Coalition, Forbes Tate, nor Ms. DiMuzio has been identified in any parties' initial disclosures

or witness disclosures provided to date.[2]

### C.      The Document Requests

Apple's Subpoenas primarily seek communications and documents related to the

Coalition's activities.  The materials sought fall into five general categories:

1. ***Coalition materials.***  Documents concerning the Coalition's formation, membership recruitment efforts, guidelines and rules, organization, staffing, strategy, financing, meeting minutes, and appfairness.org website (*see* requests 5–7, 10, and 13–17 to the Coalition; requests 5–7, 10, and 14–17 to Forbes Tate; requests 5–6, 9, 13–15 to DiMuzio);

2. ***The Messina Group / "Project Liberty" materials.***  Communications and documents exchanged between the Movants and the Messina Group—which participated in the formation of the Coalition—and its affiliates, principals, employees, and advisors, as well as documents and communications related to Epic's alleged "Project Liberty" campaign (*see* requests 11–12 to the Coalition and Forbes Tate; requests 10–11 to DiMuzio);

3. ***App Developer materials.***  Communications with any App Developer, including Epic, Microsoft, or Epic's retained experts, and documents concerning the App Store, the

---

[2] There is a third antitrust case, *Epic Games, Inc. v. Apple Inc.*, No. 20-cv-05640 (N.D. Cal.), pending in the Northern District of California against Apple relating to the App Store.  The record is closed in that case, which went to trial in May 2021.  The Movants had no involvement in that case, either.  *See* DiMuzio Decl. ¶ 9.

app marketplace, or antitrust litigation against Apple concerning the App Store (*see* requests 3 and 8–9 to the Coalition; requests 3, 8–9, and 13 to Forbes Tate; requests 3, 7–8, and 12 to DiMuzio);

4. **_Government materials._**  Communications between the Movants and various domestic and foreign governmental entities concerning the App Store, the app marketplace, or antitrust litigation against Apple concerning the App Store (*see* request 4 to the Coalition, Forbes Tate, and DiMuzio); and

5. **_Litigation materials._**  Communications with, or documents shared with, party litigants or their counsel (*see* requests 1–2 and 18–19 to the Coalition and Forbes Tate; requests 1–2 and 16–17 to DiMuzio).

*See* Exs. A–C.

On June 21, 2021, counsel for the Coalition, the Kanter Law Group, timely served objections to Apple's subpoena.  Jones Day, as counsel for Forbes Tate and Ms. DiMuzio, timely served objections on June 25, 2021.  On July 1, 2021, undersigned counsel held a meet-and-confer with counsel for Apple.  On July 2, 2021, counsel for Apple informed counsel for the Coalition that they appeared to be at an impasse and asked for an answer by July 6 as to whether the Coalition planned to produce any documents.  On July 6, counsel for the Coalition informed counsel for Apple that the Coalition does not intend to produce any documents.  On July 7, counsel for Apple notified counsel for the Coalition that Apple intends to move to compel production of the requested documents.  Counsel for Apple sent counsel for the Coalition a draft of its section of a proposed joint letter brief to be submitted to the magistrate judge handling the App Developer and App Purchaser Cases in the Northern District of California.  But, because the place of compliance for the Coalition's subpoena is the District of Columbia, *see* Ex. A, moving to compel in the Northern District of California would be improper, *see* Fed. R. Civ. P. 45(d)(2)(B)(i).  Counsel for the Coalition informed counsel for Apple that the Coalition does not consent to transferring any motion to compel to the Northern District of California.  Counsel for Forbes Tate and DiMuzio contacted counsel for Apple Inc. on July 8, 2021, in order to confer

pursuant to Local Civil Rule 7(m), but as of the time of this filing, counsel for Apple had not responded.

The four Declarations filed in support of this Motion—one from Ms. DiMuzio and three from Coalition members—further describe the Movants' activities in support of the Coalition's initiatives and attest to the chilling effect on Movants' First Amendment associational rights that disclosure of the requested materials would cause.  Ms. DiMuzio attests on the basis of personal knowledge and experience that compelled disclosure will chill the candor of communications related to the Coalition's strategy and messaging, reveal confidential strategies and tactics to its main political opponent, and expose member and non-member app developers to retribution from Apple.  David Heinemeir Hansson is the co-founder and Chief Technology Officer of Basecamp LLC and also a member of the Coalition's Board of Directors.  Kosta Eleftheriou is the Founder of FlickType.  Kirsten Daru is the General Counsel and Chief Privacy Officer of Tile, Inc.  Each of these individuals represents an app developer that is a member of the Coalition.  They each attest that enforcing the subpoenas will discourage them from openly communicating with Coalition staff and members going forward and that compelled disclosure would dissuade app companies from participating in the Coalition.

## **ARGUMENT**

Apple's sweeping and intrusive document requests directly implicate the Movants' First Amendment rights.  Indeed, that is the fairly obvious purpose of the subpoenas in the first place: Apple is trying to use discovery in the underlying litigation to gain insight into the activities of its political opponents.  Whatever relevance these materials might have to Apple's broader political and public relations efforts, they have no relevance to whether the Court should certify class actions in the underlying cases or whether Apple violated antitrust laws.  Apple cannot

meet the heightened burden required to compel disclosure of the Coalition's and its members'

First Amendment-protected activities.

## I.      LEGAL STANDARDS

### A.      Third-Party Discovery

Parties may obtain discovery "regarding any non[-]privileged matter that is relevant to

any party's claim or defense and proportional to the needs of the case," considering, *inter alia*,

"the importance of the issues at stake in the action," "the importance of the discovery in

resolving the issues, and whether the burden or expense of the proposed discovery outweighs its

likely benefit."  Fed. R. Civ. P. 26(b)(1).  A district court "must quash or modify a subpoena

that … requires disclosure of privileged or other protected matter" or "subjects a person to undue

burden."  Fed. R. Civ. P. 45(d)(3)(A).

The Rule 45 "undue burden" standard "requires district courts supervising discovery to

be generally sensitive to the costs imposed on third parties," and "concern for the unwanted

burden thrust upon non-parties is a factor entitled to special weight" in a Rule 45 inquiry.  *Watts

v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007) (Kavanaugh, J.); *see also Millennium TGA, Inc. v.

Comcast Cable Commc'ns LLC*, 286 F.R.D. 8, 11 (D.D.C. 2012) ("The text of Rule 45 makes

quite clear that parties and attorneys who issue subpoenas have an affirmative duty to prevent

undue burden or expense to the persons subject to the subpoena.").  Rule 45 must "'be construed

to secure the just, speedy, and inexpensive determination of every action'" and "district courts

should not neglect their power to restrict discovery where 'justice requires protection for a party

or person from undue burden or expense.'"  *Millennium TGA*, 286 F.R.D. at 11 (quoting *Herbert

v. Lando*, 441 U.S. 153, 177 (1979) (alterations omitted)).  Courts "frequently deny discovery

when the party requests voluminous discovery where only a small fraction of the produced

documents may be relevant." *United States v. Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. 22, 36 (D.D.C. 2012) ("*KBR*").

Discovery also may not "stray too far away from the core facts of the case." *Id.* at 36. A litigant may not "go on a 'fishing expedition' with the mere 'hope' that it will obtain relevant information." *Id.* at 37 (alterations and citation omitted). A party is not entitled to materials that "bear only the most tangential relationship" to the main issues in a case, because "the relationship between what is being sought and what it is allegedly designed to prove is too remote for compelled production." *United States v. Poindexter*, 727 F. Supp. 1470, 1480 (D.D.C. 1989); *see also Flynn v. Square One Distrib., Inc.*, No. 16-mc-25, 2016 WL 2997673, at *4 (M.D. Fla. May 25, 2016) ("[T]o be discoverable, the requested information must also satisfy the proportionality requirement meaning it must be more than tangentially related to the issues that are actually at stake in the litigation.").

### B.       First Amendment Privilege

The Supreme Court has emphasized that the discussion of public issues "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995). Thus, "[t]he First Amendment protects political association as well as political expression," *Buckley v. Valeo*, 424 U.S. 1, 15 (1976), and the "freedom to associate with others for the common advancement of political beliefs and ideas is … protected by the First and Fourteenth Amendments," *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973); *see also NAACP v. Alabama*, 357 U.S. 449, 460 (1958) ("[e]ffective advocacy" of political views "is undeniably enhanced by group association").

Based on these principles, courts have recognized a qualified privilege where the compelled disclosure of documents and communications would infringe on First Amendment rights. *See, e.g.*, *Perry v. Schwarzenegger*, 591 F.3d 1147, 1159–60 (9th Cir. 2010); *AFL-CIO v.*

*FEC*, 333 F.3d 168, 175–76 (D.C. Cir. 2003). Courts apply a two-part framework for evaluating First Amendment privilege claims in discovery. First, the party asserting the privilege must show an "arguable" infringement on First Amendment rights. *Perry*, 591 F.3d at 1160. A party can make this showing if disclosure will result in "(1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Id.* The burden of making a *prima facie* showing is not a heavy one. A party "need not prove to a certainty that its First Amendment rights will be chilled by disclosure." *Black Panther Party v. Smith*, 661 F.2d 1243, 1267–68 (D.C. Cir. 1981), *vacated on other grounds*, 458 U.S. 1118 (1982). It need only show "some probability" of a chilling effect. *Id.* at 1268; *see also Pulte*, 2017 WL 1104670, at *4; *Flynn*, 2016 WL 2997673, at *3 (The "burden [of the proponent of the privilege] is 'light,' given 'the crucial place speech and associational rights occupy under our constitution.'").

The burden then shifts to the party seeking disclosure to "demonstrate a sufficient need for the discovery to counterbalance that infringement." *Perry*, 591 F.3d at 1164. That party must "prove that the information sought is of crucial relevance to its case; that the information is actually needed to prove its claims; that the information is not available from an alternative source; and that the request is the least restrictive way to obtain the information." *Pulte*, 2017 WL 1104670, at *4. "The interest in disclosure will be relatively weak unless the information goes to 'the heart of the matter,' that is, unless it is crucial to the party's case." *Black Panther Party*, 661 F.2d at 1268.

## II.   THE REQUESTED MATERIALS ARE SUBJECT TO A FIRST AMENDMENT PRIVILEGE AGAINST COMPELLED DISCLOSURE.

### A.   All of the Document Requests Implicate First Amendment Concerns.

Collectively, Apple's document requests are broad enough to capture every confidential communication and document held by the Movants relating to the Coalition's activities.  Each of the five categories of requests, described above, implicate First Amendment concerns.

Materials relating to the Coalition's formation, membership recruitment efforts, guidelines and rules, organization, staffing, strategy, financing, meeting minutes, and appfairness.org website plainly fall within the First Amendment's protection.  As do materials sought in the Messina Group / "Project Liberty" and App Developer categories, which seek the Movants' communications with a political consulting group (The Messina Group) and app developers like Epic Games that spearheaded the Coalition's creation.  App developers, of course, comprise the Coalition's membership.

In *Perry*, the Ninth Circuit explained that compelled disclosure of confidential communications and documents of a political association can have a "deterrent effect" on "participation in campaigns" and on "the free flow of information within campaigns."  591 F.3d at 1162.  The court explained that "[i]mplicit in the right to associate with others to advance one's shared political beliefs is the right to exchange ideas and formulate strategy and messages, and to do so in private."  *Id.*  Compelled disclosure can chill associational rights because it "mut[es]" this "internal exchange of ideas."  *Id.* at 1163.  *See also Pulte*, 2017 WL 1104670, at *8 ("If a person knows that her communications will be disclosed to an unintended audience in the future, she may be more cautious in her statements or refrain from speaking entirely."); *AFL-CIO*, 333 F.3d at 177–78 (compelled disclosure of "confidential internal materials" can "seriously interfere[] with internal group operations and effectiveness" by revealing "activities,

12

strategies and tactics" to opponents).  These are the very type of materials—the Coalition's internal communications concerning the Coalition's activities, strategies, and tactics—that comprise the vast majority of Apple's document requests.[3]

The request for the Movants' communications with legislators and government officials (request number 4) also implicates First Amendment concerns.  Besides being plainly overbroad, this request directly implicates Movants' First Amendment right to "to lobby … officials to enact favorable legislation."  *FTC v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 426 (1990).  Because of the chilling effect that regulations on lobbying can have on the exercise of First Amendment rights, courts subject such regulations to heightened scrutiny.  *See, e.g.*, *Calzone v. Summers*, 942 F.3d 415, 423 (8th Cir. 2019) (lobbying disclosure law).  Consistent with the First Amendment protections afforded to lobbying communications, courts have concluded that such communications are subject to the First Amendment privilege.  *See Perry*, 591 F.3d at 1165 n.12 (privilege applies to "actual lobbying") (citation omitted); *Ass'n of Equip. Mfrs. v. Burgum*, 427 F. Supp. 3d 1082, 1102 (D.N.D. 2019); *All. of Auto. Mfrs., Inc. v. Jones*, No. 08-cv-555, 2013 WL 4838764, at *5 (N.D. Fla. Sept. 11, 2013).[4]

---

[3] Moreover, compelled disclosure can also discourage *membership* in an organization or participation in an organization's activities.  *See Perry*, 591 F.3d at 1160; *AFL-CIO*, 333 F.3d at 176.  "[A] person who belongs to a group that is required to disclose its internal communications in civil litigation may decide that the invasiveness of the disclosure outweighs the benefit of belonging to or participating in the group."  *Pulte*, 2017 WL 1104670, at *8.  This is especially true where the party resisting disclosure has a reasonable basis to fear retaliation or reprisal as a result of the disclosure.  *See, e.g.*, *NAACP*, 357 U.S. at 462–63;  *Ass'n of Equip. Mfrs. v. Burgum*, 427 F. Supp. 3d 1082, 1098 (D.N.D. 2019); *All. of Auto. Mfrs., Inc. v. Jones*, No. 08-cv-555, 2013 WL 4838764, at *4 (N.D. Fla. Sept. 11, 2013).  Here, Apple seeks any and all materials relating to the Coalition's membership—some of whom have chosen to remain anonymous.

[4] While some courts have held that lobbying communications are not subject to the First Amendment privilege, *see, e.g.*, *Sol v. Whiting*, No. 10-cv-01061, 2013 WL 12098752 (D. Ariz. Dec. 11, 2013); *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, No. 15-cv-134, 2016 WL 5922315 (W.D. Tex. Oct. 11, 2016), these holdings appear to rely on the mistaken

Finally, Apple's request for any communications with App Developer and App Purchaser plaintiffs also implicates the First Amendment.  Communications with non-members for associational purposes are subject to the First Amendment privilege.  *See, e.g.*, *Pulte*, 2017 WL 1104670, at *11 ("The citizen groups have an interest in the non-disclosure of the communications it had with third parties."); *Int'l Union*, 590 F.2d at 1147 (First Amendment protection "extends not only to the organization itself, but also to its staff, members, contributors and others who affiliate with it"); *FEC v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 388 (D.C. Cir. 1981) (demand for "communications among various [draft-Kennedy] groups" had "potential for chilling the free exercise of political speech and association guarded by the First Amendment"); *Wyoming*, 208 F.R.D. at 454 (First Amendment protects parties' "strategic communications on policy issues with other environmental advocacy groups").  In any event, any communications with plaintiffs can be obtained through party discovery and thus are "available from an alternative source."  *Pulte*, 2017 WL 1104670, at *4.

---

assumption that the parties resisting disclosure claimed "a First Amendment right not only to lobby the government, but to do so secretly."  *Wal-Mart Stores*, 2016 WL 5922315, at *7.  But Movants do not claim an *absolute* right to confidentiality of such communications.  Indeed, they recognize that the First Amendment privilege is a qualified privilege and that lobbying disclosure laws and FOIA-type laws subject some lobbying communications to a measure of disclosure.  But the position expressed in *Sol* and *Wal-Mart Stores*—that wholesale disclosure of *all* communications with the government does not chill First Amendment rights—is unsupportable.  Lobbying is protected under the First Amendment, and courts recognize that regulations on lobbying (including disclosure laws) can, to some extent, chill the exercise of speech.  *See, e.g.*, *Calzone*, 942 F.3d at 423.  Moreover, the court in *Wal-Mart Stores* specifically distinguished the case from *Jones* on the basis that the movants in *Jones* had "offered evidence that they feared reprisal and retaliation from the manufacturers, and that the manufacturers held economic power over the dealers' livelihoods."  2016 WL 5922315, at *7.  Movants have offered precisely that sort of evidence in this case.  *See infra* at 17–19.

**B.     The Movants Have Made a *Prima Facie* Showing that the Materials Requested Are Subject to the First Amendment Privilege.**

The very nature of the Coalition—it is an *association* of app developers seeking to promote change in the app ecosystem—strongly suggests that materials relating to its activities are entitled to First Amendment protection.  Moreover, as in *Perry*, Movants have submitted declarations in support of this Motion that more than exceed the minimal required showing of "some probability" of a chilling effect.  *Pulte*, 2017 WL 1104670, at *4.  These declarations show that compelled disclosure will inhibit "the free flow of information" and "mut[e] the internal exchange of ideas."  *Perry*, 591 F.3d at 1162–63.  Compelled disclosure would also reveal confidential "strategies and tactics" that would harm the effectiveness of the Coalition's advocacy efforts.  *AFL-CIO*, 333 F.3d at 177.  That is particularly true because Apple is the Coalition's main political opponent, and Apple seeks these confidential materials at precisely the moment that efforts to rein in the power of "Big Tech" have political momentum.  *See, e.g*, Paul Mozur et al., *A Global Tipping Point for Reining In Tech Has Arrived*, N.Y. Times (Apr. 20, 2021), https://www.nytimes.com/2021/04/20/technology/global-tipping-point-tech.html.  Finally, compelled disclosure of these documents will "deter[] … participation" because it will make it more difficult to attract and retain active members when the target of the Coalition's political activities wields substantial economic power over app developers.  *Perry*, 591 F.3d at 1162.  Movants have more than exceeded the minimal required showing in order to validly claim the First Amendment privilege applies.

In her declaration, the Coalition's Executive Director, Ms. DiMuzio, attests to the chilling effect that compelled disclosure of these documents would have.  She explains that the Subpoenas demand practically all documents and communications in the Coalition's possession related to its advocacy efforts.  Among the types of documents that would have to be disclosed

are communications between and among Coalition staff and members regarding developing support for government action, lobbying public officials, legislative and policy priorities, messaging strategy, media outreach, and growing membership.  DiMuzio Decl. ¶ 8.  These documents and communications contain candid opinions and advice from Coalition directors, members, and employees regarding messaging and policy focus; political and lobbying strategy memos; budget documents; drafts of press releases and other statements; documents pertaining to efforts to grow membership; communications regarding media outreach and information for reporters; and discussions of industry and policy developments.  *Id.* ¶ 11.  Ms. DiMuzio attests that disclosure will cause her to hesitate to offer candid thoughts about political strategy and messaging in the future and to sometimes refrain entirely from offering her opinions.  *Id.* ¶ 13.  She attests that many current and future employees of the Coalition (and Forbes Tate), as well as trusted advisors and consultants, will also be more cautious with respect to their statements pertaining to the Coalition's advocacy strategy and messaging.  *Id.*

Ms. DiMuzio also states that disclosure of certain documents could prejudice the Coalition's advocacy efforts because they reveal confidential lobbying and messaging strategy to its main political opponent.  *Id.* ¶ 15.  Lobbyists and advocates do not expect the detailed contents of their communications with public officials to be subject to public disclosure in the ordinary course—especially with respect to communications with members of Congress, which are not subject to FOIA.  Ms. DiMuzio states that compelled disclosure here will cause her, Coalition members and staff, and Forbes Tate employees to be more cautious in the exercise of their right to petition the government.  *Id.* ¶ 14.

The declarations submitted by representatives of the Coalition's members further show the chilling effect that compelled disclosure would have on the Coalition and its members.  Mr.

16

Hansson, the CTO and co-founder of Basecamp LLC and member of the Coalition's Board of Directors, attests that enforcing the subpoenas will "discourage Basecamp from communicating openly with other members of the Coalition and otherwise participating in its activities going forward" and that he, "as an officer of Basecamp and a member of the Coalition's Board, would be less willing to freely share [his] thoughts and opinions on various issues, such as legislation, legislators, campaigns, and the mobile platforms with the other Coalition members and potential members" if he believed that information would be subject to disclosure. Declaration of David Heinemeier Hansson ("Hansson Decl.") ¶ 13 (attached as Ex. E). Likewise, Mr. Eleftheriou, the Founder of FlickType, attests that, if he knows his "private communications with the Coalition regarding its advocacy efforts could be divulged to Apple or its counsel," he "would not feel free to communicate freely with Coalition, other members, or other app developers with similar concerns." Declaration of Kosta Eleftheriou ("Eleftheriou Decl.") ¶ 7 (attached as Ex. F). Ms. Daru, the General Counsel and Chief Privacy Officer of Tile, Inc., attests that disclosure "will affect the nature and extent of [her] participation in the Coalition's efforts in the future." Declaration of Kirsten Daru ("Daru Decl.") ¶ 6 (attached as Ex. G).

The declarations also reveal that members and prospective members reasonably fear that compelled disclosure of the requested materials would open them up to retaliation from Apple, which exercises substantial power over app developers' business. Ms. DiMuzio attests that members have expressed fear of retaliation from Apple if the Coalition's documents and communications are disclosed. DiMuzio Decl. ¶ 16. For those members that have thus far declined to be publicly identified as such, compelled disclosure would destroy their desired anonymity. *Id.* And she attests that some app developers have declined membership because of the threat of retaliation from Apple. *Id.* ¶ 17. Additionally, the requested materials contain a

17

great deal of sensitive information and communications that could open up publicly identified members to retaliation from Apple.  *Id.* ¶ 16.

Mr. Hansson attests that "Basecamp's dependence on Apple creates many opportunities for Apple to retaliate against" the company, and that, "if Apple decided to expel [its] apps from the iOS App Store, the effect on [its] business would be devastating."  Hansson Decl. ¶ 11.  He is "therefore extremely sensitive to the potential for retaliatory attacks by Apple."  *Id.*  Although Basecamp joined the Coalition because it believes strongly in its mission, Mr. Hansson states that, "[i]f we had known at the time, however, that joining could result in us being forced to turn over to Apple our communications with other Coalition members and other developers regarding Apple's abusive conduct, then we would have been far less likely to join."  *Id.* ¶ 12.  He has personally spoken to the CEOs of other app companies who said that they support the Coalition's efforts but "are unwilling to join the Coalition publicly due to fears of retaliation by Apple."  *Id.* ¶ 14.  Mr. Hansson believes that enforcing the Subpoenas "will further dissuade them from participating in advocacy against Apple's App Store policies."  *Id.*

Mr. Eleftheriou likewise attests to Apple's "immense power over developers," explaining that "it would be impossible for a single developer, particularly one as small as FlickType, to resist those policies."  Eleftheriou Decl. ¶ 6.  He states that the threat of compelled disclosure "might have dissuaded [him] from joining the Coalition in the first place."  *Id.* ¶ 7.  Ms. Daru also attests that "Apple may retaliate against Tile," and given her "business's dependence on Apple, Tile would be vulnerable to such retaliation and could be harmed by any such action."  Daru Decl. ¶ 8.  According to Ms. Daru, disclosure could "give Apple reason to single out Tile for our participation in opposing app store policies that negatively affect our business and our consumers."  *Id.* ¶ 10.  Ms. Daru states that, "[i]f we had known that Apple would be allowed

access to private communications surrounding our public advocacy regarding app store policies, we would have been less likely to agree to participate in the Coalition, particularly to the extent that we have to date." *Id.* ¶ 9.

The prospect of retaliation from Apple is no idle threat.  It has been a concern of app developers long before the Subpoenas were served.  In April of this year, representatives from app developer companies testified before Congress about Apple's anti-competitive practices and described the company's ability to leverage its power over app developers to stop them from speaking up.  For example, Spotify Chief Legal Officer Horacio Gutierrez testified about "at least four clear examples of threats and retaliation" from Apple after Spotify criticized Apple's policies, including "threats of removing Spotify's app, refusing to promote it, or waiting for months for minor app updates to be approved."  Lauren Feiner, *'We're all afraid' of Google and Apple, app makers tell Congress*, CNBC (Apr. 21, 2021), https://www.cnbc.com/2021/04/21/google-and-apple-scare-us-app-makers-tell-congress.html.  The power that Apple has over app developers' livelihoods, and the company's willingness to use it in retaliation for criticism of its policies, is a source of difficulty for the Coalition to attract and retain active members.  DiMuzio Decl. ¶ 17.

## III.    THE REQUESTED MATERIALS ARE NOT "HIGHLY RELEVANT" TO THE UNDERLYING ANTITRUST CASES.

None of the requested documents meet the "heightened relevance standard" that the First Amendment privilege demands.  *Perry*, 591 F.3d at 1164.  The central issues in the App Developer and App Purchaser Cases involve fundamental aspects of competition law, such as the definition of the relevant market, whether Apple exercises monopoly power, whether Apple engaged in anticompetitive conduct, and whether plaintiffs have suffered an antitrust injury.  *See, e.g.*, ECF No. 332 at 12–17, *Cameron*, *supra*.  The subpoenas do not ask for documents relevant

to these issues, let alone documents of "central or crucial importance to" Apple's defense.  *Pulte*, 2017 WL 1104670, at *8.  Instead, the subpoenas request documents concerning the Coalition's internal functioning, communications between and among the Coalition and its members and advisors, and the Coalition's advocacy activities on behalf of app developers.[5]

Counsel for Apple has proffered two reasons why the materials sought could be relevant.  Both reasons are wholly speculative.  And neither explains how the requested materials go to the heart of the App Developer and App Purchaser Cases or are crucial to their adjudication.  It is not even clear if Apple believes the requested materials are highly relevant to the underlying cases.

First, Apple's counsel suggests the materials sought could be relevant to the issue of "witness bias."  Initially, the vast majority of requested documents do not bear on that issue, let alone have "central or crucial importance to the case."  *Id.*  Moreover, with respect to communications between the Movants and app developers, the requests are not tailored to communications with actual witnesses.  Whether a specific app developer will even serve as a witness at trial is a matter of speculation at this point.  Nor has Apple explained why it cannot seek such documents from the witnesses themselves once they are actually identified, as counsel for Apple has confirmed they have already done with respect to some app developers.  Thus, Apple cannot establish that the documents it seeks from the Movants are "actually needed" to defend these cases or that "the information is not available from an alternative source."  *Id.* at *4.  Moreover, counsel for Apple acknowledged that they have no reason to believe that the

---

[5] The subpoenas also seek the Movants' communications with Epic and its public-relations advisors.  Apple's counsel suggested during the meet and confer that these materials are relevant to whether the Coalition was formed as part of Epic's "Project Liberty" public relations campaign.  Whatever theoretical relevance these materials might have in the *Epic* case is beside the point.  That case has already been tried.

Coalition, Forbes Tate, and Ms. DiMuzio will serve as witnesses during trial.  *See, e.g.*, *N.C. Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005) ("The bias that is relevant, however, is that of a *witness* or *party* in the case, not of an unrelated non-party.").[6]  There is simply no basis at this point to entertain Apple's fishing expedition into the Coalition and its members' First Amendment-protected activity under the speculative notion of "witness bias."

Apple's other argument for relevance fares no better.  Counsel for Apple maintains that, to the extent there are communications with app developers who declined to join the Coalition because they were supportive of Apple's App Store policies, those communications could be relevant to class certification because they might show the existence of differently situated class members who were not injured by the practices challenged in the underlying litigation.  Counsel for Apple maintains that, for similar reasons, such communications could be relevant to the merits as well.  But the personal opinions that members of the proposed class have are irrelevant to the existence of an antitrust injury.  In their motion for class certification, the App Developer plaintiffs argue that the relevant antitrust injuries, subject to common proof, are (1) the elimination of market alternatives and (2) the high commissions Apple is able to charge.  *See* ECF No. 332 at 13–14, *Cameron*, *supra*.  Whether some app developers are supportive of the App Store's policies is irrelevant to determining the existence of these antitrust injuries and has no bearing on whether common issues predominate for purposes of the Rule 23 inquiry.[7]  In any

---

[6] Regardless, discovery is not necessary with respect to these parties' biases, as the Coalition's bias against Apple is well-known and a matter of public record.  Apple does not need intrusive discovery into the Coalition's sensitive documents and communications to establish bias.

[7] Counsel for Apple can assert only that the requested documents "may" show that conflicts exist among members of the proposed class and "may" be relevant to merits issues, confirming that the proposed discovery is simply a fishing expedition into matters far afield from the cases' main issues.  Moreover, a party is generally "not permitted to seek discovery from absent class members." *Johnston v. Hertz Loc. Edition Corp.*, 331 F.R.D. 140 (E.D. Cal. 2019).

event, as with the issue of bias, the vast majority of document requests have no bearing on the

issues of injury and predominance and thus cannot be of "central or crucial importance to the

case." *Pulte*, 2017 WL 1104670, at *8.

Finally, in balancing Apple's need for the withheld documents, the Court must consider

whether the company "is seeking the information out of an actual need or because of improper

ulterior motives." *Id.* The discovery sought by Apple is ostensibly meant to help disprove that

the company violated antitrust laws through the unlawful acquisition and maintenance of

monopoly power. Yet Apple has made intrusive demands for documents and communications

with not even the slightest connection to that issue, such as the Coalition's internal governance

documents, financial support, public-relations strategy, and vast amounts of confidential

communications between and among Coalition staff, members, and others. The true purpose of

Apple's discovery requests should be obvious: the company is seeking to punish its political

opponents by prying into their confidential communications through burdensome and intrusive

discovery.[8]

## IV.   APPLE OTHERWISE SEEKS MATERIALS THAT ARE NOT RELEVANT, ARE DISPROPORTIONAL TO THE NEEDS OF THE CASE, AND ARE UNREASONABLY DUPLICATIVE.

To the extent that the Court considers some requests may fall outside the scope of First

Amendment protection, the Court should nevertheless grant the Motion to Quash based on

---

[8] Given the obvious First Amendment implications and the irrelevance of the materials sought, Movants should not be put to the expense and burden associated with searching for and preparing a privilege log. Moreover, a privilege log would itself reveal privileged material. The Court has discretion to waive any requirement to produce a privilege log if the First Amendment privilege can otherwise be tested. *See Perry v. Schwarzenegger*, 268 F.R.D. 344, 353 (N.D. Cal. 2010). Here, the subpoenas make multiple requests for documents that, on their face, demand the disclosure of confidential materials related to the Coalition's political strategy and messaging. A privilege log is not necessary to test the First Amendment privilege.

ordinary limits on third-party discovery.  For many of the same reasons described above, documents and communications held by the Coalition are simply not "relevant to any party's claim or defense" in the App Developer and App Purchaser Cases and not "proportional to the needs of the case[s]."  Fed. R. Civ. P. 26(b)(1).  Movants' documents and communications are of no "importance [to] resolving the issues" in these cases, and the burdens of the proposed discovery on the Movants "outweigh[] its likely benefit."  *Id.*

As an initial matter, the sheer breadth of the document requests compared to the relatively narrow issues for which Apple seeks them runs afoul of discovery rules regarding relevance and proportionality.  Apple seeks literally every communication and document in the Coalition's possession, yet counsel for Apple articulated only two reasons for relevance for the entirety of the document requests:  (1) the bias of potential app-developer witnesses, and (2) the impact of positive opinions of the App Store held by non-member app developers on class and merits issues.  The vast majority of document requests have no bearing on these issues at all, *see, e.g.*, *KBR*, 284 F.R.D. at 36–37 (courts "frequently deny discovery when the party requests voluminous discovery where only a small fraction of the produced documents may be relevant"), and, as explained, *supra* at 19 – 22, are irrelevant, or at least not important to "resolving the issues" in this case, Fed. R. Civ. P. 26(b)(1).  This Court should not authorize Apple's attempt to go on a "'fishing expedition' with the mere 'hope' that it will obtain relevant information." *KBR*, 284 F.R.D. at 37 (alterations omitted).

Moreover, many of the document requests are "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."  Fed. R. Civ. P. 26(b)(2)(C)(i).  For example, the subpoenas ask for communications with and documents produced to plaintiffs in the App Developer and App Purchaser Cases.  *See*

Ex. A (Request Nos. 1, 2, and 18).  These documents, to the extent there are any and they do not come within the First Amendment privilege, are obtainable through party discovery. Additionally, with respect to the narrow category of documents that counsel for Apple considers relevant, communications with potential app-developer witnesses can be sought from those witnesses when they are identified, and Apple can seek documents and communications directly from app developers who support App Store policies.

## **<u>CONCLUSION</u>**

Movants respectfully request that the Court grant their Motion to Quash.


Dated: July 8, 2021

*/s/David S. Torborg*
David S. Torborg (D.C. Bar No. 475598)
Stephen J. Kenny (D.C. Bar No. 1027711)
Joseph P. Falvey (D.C. Bar No. 241247)
JONES DAY
51 Louisiana Ave. NW
Washington, DC, 20001-2113
Tel.: 202-879-3939
Fax: 202-626-1700
dstorborg@jonesday.com

*Attorneys for Forbes Tate Partners and*
*Meghan DiMuzio*

Brandon Kressin (D.C. Bar No. 1002008)
KANTER LAW GROUP
1717 K Street NW
Suite 900
Washington, DC 20006
Tel.: 202-792-3037
brandon@kanterlawgroup.com

*Attorney for the Coalition for App Fairness*